UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>MARLON LARON SIMIEN,<br><br>    Defendant. | No. SA: 22-CR-00379-JKP |

## RESPONSE OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Defendant has moved to dismiss his indictment, arguing that 18 U.S.C. §§ 922(n) & (o) are now unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). This Court should reject his Second Amendment challenge. Nothing in *Bruen* casts doubt on the constitutionality of 18 U.S.C. §§ 922(n) & (o).

First, neither statute burdens conduct covered by the Second Amendment's protection of "the right to keep and bear arms." Section 922(n) does not disarm felony indictees who already had guns. It does not prohibit possession or public carry but imposes only a temporary, narrow restriction on procuring a gun while a felony indictment is pending. Meanwhile, § 922(o) permissibly prohibits the possession of machineguns—dangerous and unusual weapons that do not receive Second Amendment protection.

Second, both statutes square with the nation's historical tradition of gun regulation. For § 922(n), the Second Amendment has always allowed laws restricting the gun rights of groups viewed by legislatures as posing a public-safety risk, including those accused but not convicted of wrongdoing. And restricting indictees' gun rights fits a broader tradition of substantially restricting indictees' liberty while their criminal case is pending. As for § 922(o), this nation has a historical tradition of prohibiting the possession and carrying of dangerous and unusual weapons. Thus, both statutes are consistent with established historical traditions, and they are constitutional.

## FACTUAL BACKGROUND

On July 1, 2022, law enforcement arrested Defendant, Marlon Simien, on an arrest warrant for Aggravated Robbery as he left his apartment in San Antonio. Defendant had previously pleaded guilty to the Aggravated Robbery charge on March 2, 2018 and received eight years' deferred adjudication probation. He had since violated that probation, resulting in the arrest warrant.

During the arrest, officers searched Defendant and found a Glock machinegun loaded with a high-capacity magazine in his pants. They also searched his apartment and found another machinegun—a modified Palmetto State Armory, model PA-15, multi-caliber rifle. In an interview, Defendant admitted that he had bought the Glock, which he knew was a machinegun, about two weeks earlier. He also admitted that he had stolen the rifle about a month before his arrest.

For this incident, Defendant was indicted for Illegal Possession of a Machinegun, in violation of 18 U.S.C. § 922(o), and Receipt of a Firearm While Under Indictment, in violation of 18 U.S.C. § 922(n). ECF No. 15. Defendant has since moved to dismiss the indictment, citing the Supreme Court's recent decision in *Bruen*. ECF No. 27.

## LEGAL BACKGROUND

### I.     Statutory Background

Defendant has challenged two statutes. The first, 18 U.S.C. § 922(n), makes it unlawful "for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to … receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The second, 18 U.S.C. § 922(o), makes it "unlawful for any person to transfer or possess a machinegun."

The federal prohibition in § 922(n) has existed in some form since 1938. That year, Congress first limited gun access by people under indictment as well as by convicted felons. *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011); *see United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938" (citing Federal Firearms Act of 1938, ch. 850, § 2(f), 52 Stat. 1250, 1251)). The original federal prohibition reached only those under indictment for or convicted

of crimes of violence. *Laurent*, 861 F. Supp. 2d at 82. In 1961, Congress expanded the prohibitions to include all crimes. *Id.* at 83.

Congress later passed the Gun Control Act of 1968, which updated the restrictions on gun access by people under indictment and by convicted felons. *Id.* Among other things, the Gun Control Act "clarified the definition of 'indictment' to include an information or indictment in *any court*—state or federal—if the court had power to prosecute any crime punishable by more than one year in prison." *Id.* (emphasis original). It "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons." *Id.* (cleaned up) (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976)).

In 1986, Congress again amended the Gun Control Act, passing the two sections at issue here. First, Congress "revised the statute to combine the provisions of § 922(g)(1) and (h)(1) that dealt with indictees into a single section, § 922(n)." *Id.* at 84. Second, Congress passed § 922(o), making it unlawful for any person to possess a machinegun "with certain exceptions for government entities and machineguns lawfully possessed before 1986." *Hollis v. Lynch*, 827 F.3d 436, 440 (5th Cir. 2016).

## II.     The Second Amendment

Defendant's challenge is predicated on the Second Amendment, which states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment gives law-abiding, responsible citizens a right to keep and bear arms for lawful purposes like self-defense in the home. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms in homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

In *Heller*, the Court emphasized that the Second Amendment right is "not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. "[N]othing in [the *Heller*] opinion [was to] be taken to cast doubt

on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" that it "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" (cleaned up)).[1] The Court meant its list of "presumptively lawful regulatory measures only as examples," not as exhaustive. *Heller*, 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Applying that standard, the Court held unconstitutional New York's licensing law, which allowed an applicant to obtain a license to carry a gun outside his home only by proving that "proper cause exists." *Id.* at 2123. New York courts had read "proper cause" as "a special need for self-protection distinguishable from that of the general community." *Id.* First, the Court held that the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners— "two ordinary, law-abiding, adult citizens"—were undisputedly among "'the people' whom the Second Amendment protects." *Id.* at 2134. And their proposed conduct—"carrying handguns publicly for self-defense"—fell within "the right to keep and bear arms." *Id.*

Second, the Court surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether New York's licensing law

---

[1] Although Defendant dismisses this language as dicta, even if Defendant is correct, the Court is "generally bound by Supreme Court dicta, especially when it is recent and detailed. *Hollis*, 827 F.3d at 448 (quotations omitted).

**Government's Response in Opposition to Defendant's Motion to Dismiss**                    **4**

squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

### III.    Facial And As-Applied Constitutional Challenges

Here, Defendant has brought a facial challenge to §§ 922(n) and 922(o) and nominally asserts an as-applied challenge. "To sustain a facial challenge, the challenger must establish that no set of circumstances exists under which the statute would be valid." *United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020) (cleaned up). "Facial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort." *Id.* at 752–53. As for an as-applied challenge, that requires Defendant to show that the application of the challenged statute to the facts of his case would violate his constitutional rights. *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022).

## ARGUMENT

### I.    The Second Amendment's Text Does Not Cover Receiving Guns While Under Indictment Or The Possession Of Machineguns

The modest restrictions in §§ 922(n) and (o) do not unconstitutionally limit any conduct covered by the Second Amendment's plain text. Thus, this Court need not consider whether sections 922(n) and (o) square with the nation's historical tradition of gun regulation because Defendant has not met his initial burden to show that the Second Amendment covers his conduct. Indeed, he cannot carry his burden because "the right to keep and bear arms" does not cover "receiv[ing]" guns while under indictment or the possession of machineguns.

### A.   The Party Challenging A Gun Regulation Has The Burden To Show That The Second Amendment's Text Covers His Conduct

In *Bruen*, although the Supreme Court did not address which party has the burden of showing that the Second Amendment's text covers—and thus "presumptively" protects—the conduct at issue, s*ee* 142 S. Ct. at 2130, it implies that the party challenging a gun regulation has the initial burden.

As described above, the Court's analysis proceeded in two steps: it asked, first, whether the Second Amendment's plain text covers the conduct at issue and, second, whether the regulation squares with the nation's tradition of gun regulation. *See, e.g.*, *id*. at 2126, 2130. At step two, the Court assigned the government the burden of offering historical evidence to support the regulation. *Id.* To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). The Court did not need to address which party has the burden at step one since the parties did not dispute that the respondents were among "the people" whom the Second Amendment protects and that publicly carrying handguns for protection fell within "the right to keep and bear arms." *Id.* at 2134.

The Supreme Court's First Amendment analogy, however, provides the answer: The party challenging a gun regulation has the burden at step one. In the First Amendment context, although the government has the burden of justifying a purported restriction on the freedom of speech, the party challenging the restriction must show that the First Amendment applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984)); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). Similarly, here Defendant has the burden of showing that the Second Amendment applies to—and thus presumptively protects—his conduct. He cannot do so.

**B.    The Right To "Keep And Bear Arms" Does Not Cover Receiving Guns While Under Indictment.**

Defendant cannot show that the Second Amendment's text covers receiving a gun while under felony indictment. The Supreme Court said little about this threshold question in *Bruen* because the parties there agreed that the conduct at issue—publicly carrying handguns for protection—fell within "the right to keep and bear arms." 142 S. Ct. at 2134. In discussing whether the Second Amendment creates a collective or individual right, however, *Heller* shed light the amendment's text. The Court explained that "the most natural reading of 'keep arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. Similarly, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584. "When used with 'arms,' … the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.*

Section 922(n) does not directly burden the rights to "have" arms or to "carry" them for confrontation. "By its own terms, § 922(n) does not prohibit possession of a weapon by someone under indictment, but only shipping, transportation, or *receipt*." *Laurent*, 861 F. Supp. 2d at 85. (Only the "receipt" alternative is at issue here.) Thus, while § 922(n) temporarily bars a person from *obtaining* a gun while felony charges are pending against him, it does not bar the person from continuing to have or carry guns he already had before he was indicted. The Second Amendment's text does not necessarily imply a right to *obtain* guns. *Cf. Heller*, 554 U.S. at 626–27 (noting that the Court's opinion did not invalidate "laws imposing conditions and qualifications on the commercial sale of arms"); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 206 (5th Cir. 2012) (holding that laws did "not severely burden the Second Amendment rights of 18-to-20-year-olds because" they did not ban use or possession but "impose[d] an age qualification on commercial firearm sales").

**C.    The Right To "Keep And Bear Arms" Does Not Cover Possession Of Machineguns.**

The analysis of whether machineguns receive Second Amendment protection begins with *United States v. Miller*, in which the Supreme Court rejected a Second Amendment challenge to the indictment of two men for transporting an unregistered short-barreled shotgun in interstate

commerce, in violation of the National Firearms Act. 307 U.S. 174, 178 (1939). In *Heller*, the Supreme Court explained that *Miller* stands for the proposition "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizen for lawful purposes, such as short-barreled shotguns." 554 U.S. at 625. *Heller* also soundly rejected a proposed reading of *Miller* that would render the National Firearms Act's restrictions on machineguns as unconstitutional. *Id*. at 624.

In essence, *Heller* "distinguished between two classes of weapons: (1) those that are useful in the militia or military, and (2) those that are possessed at home and are in common use at the time for lawful purposes like self-defense." *Hollis*, 827 F.3d at 445 (quotations omitted). "The individual right protected by the Second Amendment applies only to the second category of weapons, though that category at times may overlap with the first." *Id*. And, because protected weapons are only "those in common use at the time", *Heller*, 554 U.S. at 627, "dangerous and unusual" weapons are not in common use and not protected by the Second Amendment. *Hollis*, 827 F.3d at 446.

In *Hollis*, the Fifth Circuit squarely held that machineguns "do not receive Second Amendment protection" because they "are dangerous and unusual and therefore not in common use." *Id*. at 451. This has not changed. Machineguns remain dangerous; likened to pipe bombs and hand-grenades—these weapons of "quasi-suspect character" are inherently dangerous. *Id*. at 448 (quoting *Staples v. United States*, 511 U.S. 600, 611-12 (1994)).

They are also unusual. In *Hollis*, the Court held that the number of civilian-owned machineguns, about 176,000, fell far short of the amount necessary to be considered in common use. *Id*. at 449-50. Although that number has since increased, rising to about 740,000 machineguns lawfully possessed, this amount remains too low for machine guns to be considered in common use. Indeed, these machineguns are an insignificant percentage of the nearly 400 million firearms estimated to be lawfully possessed in the United States. *See* Karp, Aaron, Briefing Paper – Estimating Global Civilian-Held Firearms Numbers, p. 4, (accessed at https://www.smallarmssurvey.org/sites/default/files/resources/SAS-BP-Civilian-Firearms-

Numbers.pdf); *see also Hollis*, 827 F.3d at 449 (noting that courts have relied on "proportions and percentages" in the unusualness analysis). Weapons that amount to less than .2% of the total amount of firearms in the United States can hardly be said to be "in common use."[2]

In response, Defendant relies on Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), arguing that machineguns are more common than stun guns, which Justice Alito stated are "widely owned and accepted as a legitimate means of self-defense." But little has changed in the six years since the Fifth Circuit considered and rejected this precise argument. As the Court explained, "Justice Alito did not think the absolute number by itself was sufficient. Rather, he thought the number was sufficient when paired with the statistic that stun guns may be lawfully possessed in 45 states." *Hollis*, 827 F.3d at 450. In contrast, "[t]he same showing cannot be made for machineguns," which are widely banned or restricted. *Id*. Because this still holds true, Defendant is left without "the numbers to support his claims", and machineguns remain unusual. *See id*.

Finally, nothing in *Bruen* disturbed *Miller*, *Heller*, or *Hollis*. In his concurrence in *Bruen*, Justice Alito explained that the decision decided nothing "about who may lawfully possess a firearm" or "about the kinds of weapons that people may possess." 142 S. Ct. at 2157 (Alito, J., concurring). Nor does it disturb any of the statements in *Heller* or *McDonald* "about restrictions that may be imposed on the possession or carrying of guns." *Id*. Similarly, Justice Kavanagh reiterated that, "properly interpreted, the Second Amendment allows a variety of gun regulations." *Id*. at 2162 (Kavanagh, J., concurring). As he emphasized, an "important limitation on the right to keep and carry arms" remains "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627. This has not changed, and such weapons do not fall

---

[2] The amount of machineguns also remains "far below" the numbers the *Hollis* court considered relevant—the 50 million large-capacity magazines considered by the Second Circuit in *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) or the 8 million AR and AK-platform semi-automatic rifles considered by the Fourth Circuit in *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

within the ambit of the Second Amendment's protection. *Hollis*, 827 F.3d at 451. Thus, Defendant's Second Amendment challenge should be dismissed.

## II.     The Prohibitions In Sections 922(n) And 922(o) Square With The Nation's Historical Traditions

Even if this Court finds that the Second Amendment's plain text covers Defendant's conduct, his Second Amendment claim fails because both § 922(n) and § 922(o) are "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. *Bruen* contemplates two avenues of inquiry: (1) a "straightforward historical inquiry" to search for historical regulations similar to the modern-day regulatory counterpart or evidence that a comparable historical regulation was rejected on constitutional grounds; or (2) a "historical analogy." *Id*. at 2131-34. This latter inquiry asks not whether the statutory restrictions existed at the founding but requires "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2130; *see also Nat'l Rifle*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133. Here, the historical record shows a longstanding tradition of restricting the gun rights of "unvirtuous" or dangerous citizens and of prohibiting the possession of dangerous and unusual weapons.

## A.     Section 922(n) Squares With The Historical Tradition Of Categorically Restricting The Gun Rights Of Unvirtuous Or Dangerous Citizens

The Second Amendment sets forth a "right of law-abiding, responsible citizens." *Id*. at 2131 (quoting *Heller*, 554 U.S. at 635). The nation's historical tradition, however, embraces restricting the gun rights of citizens viewed by legislatures as unvirtuous or potentially dangerous.

The government has always categorically restricted the gun rights of some groups to promote public safety. In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). And "the act of 'going armed to terrify the King's

subjects' was 'a great offence at the common law'" if it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (brackets and italics omitted) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing history).

Likewise, "[t]he historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle*, 700 F.3d at 200. The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145.[3] As *Bruen* observed, those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)).

Early colonial regulations also "included safety laws … disarming certain groups and restricting sales to certain groups." *Nat'l Rifle*, 700 F.3d at 200. "For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007); Saul Cornell

---

[3] *See, e.g.*, Acts and Laws of His Majesty's Province of New Hampshire in New England 17 (1771) (statute enacted 1701); Collection of All Such Acts of the General Assembly of Virginia 33 (1794) (statute enacted 1786); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807 p. 653 (1807) (statute enacted Jan. 29, 1795); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836) (statute enacted 1801).

& Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994).

Historical accounts confirm the founders' attitudes towards disarming potentially dangerous groups. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674–75, 681 (emphasis added). Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

Indeed, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources)); *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (same). The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011)

**Government's Response in Opposition to Defendant's Motion to Dismiss** **12**

(quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

The Supreme Court has recognized the historical tradition of disarming unvirtuous or dangerous citizens. In *Heller*, it endorsed "longstanding prohibitions on the possession of firearms by felons and the mentally ill," among others. *Heller*, 544 U.S. at 626–27. The Court "identif[ied] these presumptively lawful regulatory measures only as examples; [its] list d[id] not purport to be exhaustive." *Id.* at 627 n.26. In *McDonald*, the Court reiterated that *Heller* "did not cast doubt on" those "longstanding regulatory measures." 561 U.S. at 786. Likewise, nothing in *Bruen* casts doubt on those longstanding regulations. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that the Court's decision "does not expand the categories of people who may lawfully possess a gun"); *id.* at 2162 (Kavanaugh, J., concurring) (reiterating *Heller*'s statements).

Courts relying on this "'virtuous citizen' theory" have thus upheld "modern laws banning the possession of firearms by illegal aliens and juveniles—classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina*, 913 F.3d at 159. In *National Rifle*, this Court rejected a Second Amendment challenge to § 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted." 700 F.3d at 204. The court explained that the regulation "is consistent with a

longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *Id.* at 203.[4]

Courts have reasoned similarly for other categorical restrictions like *Heller*'s nonexhaustive list of presumptively lawful regulations. *See, e.g.*, *Yancey*, 621 F.3d at 684–87 (relying on historical evidence to uphold § 922(g)(3)'s prohibition of gun possession by illegal drug users); *Bena*, 664 F.3d at 1184 (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *Skoien*, 614 F.3d at 640 (same for § 922(g)(9)'s prohibition of gun possession by those convicted of misdemeanor crimes of domestic violence); *Rene E.*, 583 F.3d at 16 (rejecting a Second Amendment challenge to § 922(x), which restricts the ability of people under 18 to possess handguns, and explaining "that the founding generation would have regarded such laws as consistent with the right to keep and bear arms").

Like the felon-in-possession laws endorsed in *Heller* and the age-based restriction addressed in *National Rifle*, § 922(n) "is consistent with a longstanding tradition of targeting select groups' ability to access … arms for the sake of public safety." *See* 700 F.3d at 203. Section 922(n)'s legislative history shows that, like other categorical restrictions on select groups, it "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons." *Laurent*, 861 F. Supp. 2d at 82 (ellipses omitted) (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976)). Indeed, by excluding mere possession of guns and focusing on receipt, § 922(n) reaches only a limited class of obviously risky citizens: those who obtain guns

---

[4] *Bruen* abrogated *National Rifle* to the extent that it held that a gun regulation could survive a Second Amendment challenge under means-end scrutiny, even if it is not consistent with the nation's historical tradition of gun regulation. *See* 142 S. Ct. at 2127 n.4. But the Court was "inclined to uphold the challenged federal laws at step one of [its] analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on the historical record and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates he Court's or other courts' historical analyses, which were typically considered part of "step one" under courts' pre-*Bruen* case law.

while facing felony charges. *See United States v. Khatib*, No. 12-CR-190, 2012 WL 6086862, at *4 (E.D. Wis. Dec. 6, 2012), *report and recommendation adopted*, 2012 WL 6707199 (E.D. Wis. Dec. 26, 2012) (noting there is often good reason to "infer a malevolent intent when" someone responds to being indicted by procuring a gun). Even still, § 922(n)'s narrow and temporary restriction on receipt burdens far less conduct than the categorical prohibition of *possession* by other groups, like convicted felons.

Although a person who has been indicted but not convicted is presumed innocent, a legislature's decision to restrict felony indictees' gun access is consistent with historical public-safety laws. For an indictment, a grand jury must find probable cause to believe that a felony indictee has committed "the most serious category of crime deemed by the legislature to reflect 'grave misjudgment and maladjustment.'" *Medina*, 913 F.3d at 158 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)). At the founding, moreover, a felony indictment foretold far severer consequences for the indictee than the loss of gun rights. The standard punishment for a felony was death. *Medina*, 913 F.3d at 158. ("Capital punishment for felonies was ubiquitous in the late Eighteenth Century and was the standard penalty for all serious crimes." (cleaned up)). It is "difficult to conclude" that the founding generation would have understood those standing accused of capital crimes, and thus facing death if convicted, to enjoy unfettered gun rights. *See id.* To the contrary, those under felony indictment were among the "unvirtuous citizens," *see Yancey*, 621 F.3d at 684–85, whom legislatures could lawfully disarm.

Further, it is irrelevant that the modern federal restriction on receipt of firearms by those under felony indictment comes from the mid-20th Century. Indeed, § 922(g)(1)'s "prohibition[] on the possession of firearms by felons"—which *Heller* expressly endorsed—has exactly the same historical pedigree as § 922(n)'s restriction on felony indictees. *See* 544 U.S. at 626–27. The federal felon-in-possession law too is "of mid-20th century vintage." *Nat'l Rifle*, 700 F.3d at 196. It "was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968." *Id.*; *see also Skoien*, 614 F.3d at 640 (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until

1938"). Those same 1938, 1961, and 1968 laws created and revised § 922(n)'s restrictions on indictees. *See Laurent*, 861 F. Supp. 2d 82–84 (describing § 922(n)'s legislative history). *Heller*'s point in endorsing felon-in-possession laws was not that they had existed since the founding but that they were *analogous enough* to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. So too with § 922(n)'s restriction on indictees.

### B.      Section 922(n) Squares With The Historical Tradition Of Restricting The Rights Of Those Accused Of Wrongdoing.

Section 922(n) also squares with a related tradition of restricting the liberties—including the gun rights—of those credibly accused of posing a risk to the community's peace or safety. Three kinds of analogous restrictions illustrate this tradition: (a) historical surety laws requiring citizens credibly accused of posing a risk to post a bond before carrying a gun; (b) shall-issue licensing regimes—expressly endorsed in *Bruen*—many of which operate almost identically to § 922(n) by categorically disqualifying indictees for licenses; and (c) pretrial release conditions disarming indicted defendants.

*Historical Surety Laws*. English and early American surety laws support categorically restricting the gun rights of those accused but not convicted of wrongdoing. In England, a "surety of the peace followed an accusation by someone that an individual would likely violate the law in the future." *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), *vacated*, 2022 WL 2347578 (U.S. June 30, 2022); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017) (explaining that English surety laws required a person "reasonably accused of posing a threat" "to post a bond to be used to cover any damage he might do" by carrying a gun). As Blackstone explained, "wherever any private man hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; … he may demand surety of the peace against such person." 4 William Blackstone, Commentaries on the Laws of England 252 (1769). And if the person against whom the accusation was made did not "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be committed till he [did]." *Id.* The surety was "intended merely for prevention, without any crime

actually committed by the party, but arising only from a probable suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249.

This common-law surety practice carried over to the American colonies. "In the mid-19th century, many jurisdictions [in the United States] began adopting surety statutes that required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148; *see Heller*, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" as a means of determining "the public understanding" of the Amendment (italics omitted)). Massachusetts passed the first such law in 1836. *Bruen*, 142 S. Ct. at 2148. Under the Massachusetts law, if any person was armed and could not show a special need for self-defense, he could "on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace." Mass. Rev. Stat. ch. 134, § 16 (1836). "Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law." *Bruen*, 142 S. Ct. at 2148.

These laws offer another imperfect but relevantly similar analogue to § 922(n). On the one hand, an indictee cannot overcome § 922(n)'s restriction by posting a bond. On the other hand, § 922(n) has more procedural safeguards than the surety laws since a person could be required to post a bond based on another's oath alone (and sometimes did not even require the oath to establish a completed crime), 4 Blackstone 252, whereas § 922(n) typically requires a grand jury-finding of probable cause that a crime was committed. And the surety laws—like pretrial release conditions and shall-issue licensing regimes—more directly burdened core Second Amendment rights by restricting public carry rather than receipt only. Finally, like § 922(n)'s restriction, which lasts only while a person is "under indictment," the surety laws' restrictions lasted only for a specified time. *See* 4 Blackstone 249–50.

*Shall-Issue Licensing Regimes*. States also commonly restrict the gun rights of those charged with crimes, and the Supreme Court endorsed those restrictions in *Bruen*. Although the Court invalidated New York's licensing regime giving officials discretion to deny licenses absent a showing of special need, it noted that "nothing in [its] analysis should be interpreted to suggest

the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S. Ct. at 2138 n.9; *see also id.* at 2161 (Kavanaugh, J. concurring) ("[T]he Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 states."). The Court described those shall-issue regimes as setting "narrow, objective, and definite standards" to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted).

Those shall-issue regimes, in turn, work analogously to § 922(n). Among their objective eligibility criteria for obtaining a license, they commonly disqualify those under felony indictment. *See, e.g.*, Tex. Gov't Code § 411.172(a)(4) (requiring that the applicant "is not charged with the commission … of a felony under an information or indictment"); La. Stat. § 40:1379.3(C)(10) (requiring that the applicant "not be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"). Those schemes thus defeat—for anyone under felony indictment—what *Bruen* called the core Second Amendment right to bear arms in public for self-defense. *See* 142 S. Ct. at 2134–35. If the Court views those regimes as consistent with the nation's tradition of gun regulation, then surely it would hold the same for § 922(n), which does not burden the right of public carry but merely bars people from receiving guns while under indictment.

*Pretrial Release Conditions*. Pretrial release conditions supply yet another analogous historical restriction on the gun rights of indictees. The government has always been able to impose "substantial liberty restrictions" on indicted defendants (including detention or, alternatively, conditions of pretrial release) when needed to promote "the operation of our criminal justice system." *United States v. Salerno*, 481 U.S. 739, 749 (1987). Thus, among other things, a federal court can order a person on federal pretrial release to "refrain from possessing a firearm, destructive device, or other dangerous weapon" if needed to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(viii). *See United States v. Perez-Garza*, No. 3:22-CR-01581-GPC, 2022 WL 4351967, at *4–7 (S.D. Cal. Sept. 18, 2022) (rejecting facial and as-applied *Bruen* challenges to

prohibition of gun possession imposed as a standard condition of pretrial release under § 3142 and collecting authorities approving of restrictions on the gun access of certain groups, like those charged with crimes).

Section 3142(c)(1)(B)(viii) supplies a longstanding analogue to § 922(n). It is "relevantly similar" to § 922(n), *see Bruen*, 142 S. Ct. at 2132, though it is narrower in some ways and broader in others. Section 3142(c)(1)(B)(viii) is narrower than § 922(n) because it requires an individualized risk assessment whereas § 922(n) applies categorically. Yet § 3142(c)(1)(B)(viii) applies more broadly in other ways: it covers anyone charged with a federal crime (not just felonies), whether by indictment, information, or complaint (the latter not requiring a probable-cause finding by a grand jury). And when a court imposes the firearm condition on a pretrial releasee, it bans *possession* and thus directly burdens the core Second Amendment right to keep and bear arms, whereas § 922(n) only bars receipt.[5]

### C.   The Weight Of Persuasive Authority Confirms That § 922(n) Is Consistent With Historical Tradition

No binding precedent address whether § 922(n) violates the Second Amendment. That question is before the Fifth Circuit, however, in a case tentatively calendared for argument the first week of December 2022. Tentative Calendar Notice, *United States v. Avila*, No. 22-50088 (5th Cir. Sept. 14, 2022), ECF No. 516471616. The government expects the Fifth Circuit to confirm in *Avila* that § 922(n) is constitutional.

---

[5] The district-court cases Defendant cites addressing the Adam Walsh Amendments to Bail Reform Act do not support his Second Amendment claim. Def. Br., at 13 (citing *United States v. Kennedy*, 593 F. Supp. 2d 1221, 1230 (W.D. Wash. 2008); *United States v. Arzberger*, 592 F. Supp. 2d 590, 601 (S.D.N.Y. 2008); *United States v. Torres*, 566 F. Supp. 2d 591, 601–03 (W.D. Tex. 2008)).) That law mandates certain pretrial release conditions for defendants charged with certain crimes. *See* 18 U.S.C. § 3142(c)(1)(B). The cited cases held that because the law mandates the conditions without procedural safeguards, it violates the defendant's procedural due-process rights under the Fifth Amendment, and in some instances may violate the Eighth Amendment's excessive-bail clause. The analysis conducted in those cases is inapplicable here: the rights asserted in those cases do not limit Congress's power to define criminal conduct. More, those cases did not address the Second Amendment, let alone consider whether the gun regulations at issue squared with historical tradition (to the extent they specifically considered the gun regulations at all).

One decision to consider a *Bruen* challenge to § 922(n) upheld the statute. *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022). The court observed that "historical support for excluding those under indictment from the protections of the Second Amendment is limited—the first federal statute restricting an indicted individual's access to firearms was not enacted until 1938." *Id.* at *4. Still, the court found "that the surety laws discussed in *Bruen* are proper historical analogues for § 922(n)." *Id.* at *5. The court explained that, like § 922(n), the surety laws did not apply to "every citizen" but only to those credibly accused of posing a danger. *Id.* at *4. Also like § 922(n), the surety laws imposed only a temporary restriction. *Id.* "Even so," the court continued, § 922(n) imposes an arguably narrower restriction than the surety laws because it does not restrict a person's right to publicly carry a gun but "simply limits [his] right to receive a firearm during the pendency of an indictment." *Id.* at *5.

The *Kays* approach is the right one. Although another member of this Court ruled in *United States v. Quiroz*, --- F. Supp. 3d ----, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) that § 922(n) violates the Second Amendment, *Quiroz* reflects an overly rigid reading of *Bruen*. In *Quiroz*, the court acknowledged that, as it read *Bruen*, requiring the government to "prove a historical tradition for every regulation restricting a specific subgroup … creates an almost insurmountable hurdle" and "an uphill battle" for the government. (*Id.* at *8.) Yet that is the standard to which the court held the government's historical analogies. Few regulations—likely not even felon-in-possession laws—would survive the court's reasoning. *Bruen*, in contrast, said that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." 142 S. Ct. at 2133. The Court thus explained that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*; *see also id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)). The government's analogies, if imperfect, are sufficient to sustain § 922(n).

*Quiroz* also too readily dismissed the analogy to felon-in-possession laws and other historical restrictions on potentially dangerous groups. 2022 WL 4352482, at *5–7. Because the

*Bruen* analysis turns on history, those laws' shared history is a centrally relevant similarity. The Supreme Court said that felon-in-possession laws are sufficiently "longstanding," and so it is reasonable to infer that it would say the same of other laws with the same historical pedigree and growing out of the same tradition of disarming potentially dangerous groups. *Quiroz* also described the Supreme Court's endorsement of felon-in-possession laws as dicta, but lower courts "are generally bound by Supreme Court dicta, especially when it is recent and detailed." *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (quotation marks omitted).

Similarly, *Quiroz* too readily dismissed the analogy to surety laws and did not address the analogy to shall-issue licensing regimes that operate almost identically to § 922(n). The court determined that surety laws used a materially different means than § 922(n): requiring the accused to post a money bond to carry guns rather prohibiting receipt of firearms (while allowing carry). 2022 WL 4352482, at *7–8. This reasoning effectively requires "a historical *twin*." 142 S. Ct. at 2132. As *Kays* observed, § 922(n) and the surety laws are relevantly similar because both require a specific showing of reasonable cause and both apply only during the accusation's pendency. 2022 WL 3718519, at *4–5. *Kays*, not *Quiroz*, draws the proper comparison to the surety laws.

Finally, *Quiroz*'s other reasons for doubting § 922(n)'s constitutionality do not defeat the government's showing. True, § 922(n) applies upon indictment without adversarial process. 2022 WL 4352482, at *10–11. But, as the surety analogy shows, the Second Amendment does not necessarily require adversarial process to place a person into a presumptively dangerous group whose gun rights can be constitutionally restricted, especially when the restriction falls short of an outright ban on possession and carry. A credible accusation is enough. Next, while *Quiroz* cites historical laws used as pretexts to disarm people based on race, *id.* at *11–12, it does not evince that § 922(n) has been so used. Finally, *Quiroz* cites cases to show that some early decisions upheld parts of the Federal Firearms Act on the assumption—rejected in *Heller*—that the Second Amendment sets for a "collective" rather than individual right. *Id.* at *12. Yet *Quiroz* gives no reason to think the collective-rights reasoning of pre-*Heller* cases infects the veritable mountain of post-*Heller* precedent likewise upholding FFA restrictions similar to § 922(n). *See, e.g.*, *Mance*

*v. Sessions*, 896 F.3d 699 (5th Cir. 2018); *Nat'l Rifle*, 700 F.3d at 206; *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011). Thus, this Court should decline to follow *Quiroz* and should instead uphold the constitutionality of § 922(n).

### D.    Section 922(o) Squares With The Historical Tradition Of Restricting The Possession Of Dangerous And Unusual Weapons

As for § 922(o), a "straightforward historical inquiry" suffices. *Heller* is clear—this nation has a "historical tradition of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627.[6] This longstanding tradition grew from English common law, under which "the offense of riding or going armed, with dangerous or usual weapons, [was] a crime." 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769); *see also State v. Langford*, 3 Hawks 381, 383 (NC 1824) (A man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people.").

In response, Defendant attempts to avoid *Heller* by distinguishing between the *possession* of a dangerous and unusual weapon from the *carrying* of a dangerous and unusual weapon. His argument is unpersuasive. *Heller* drew no such distinction. Indeed, when discussing *Miller*, *Heller* was clear that "the Second Amendment does not protect those weapons not typically *possessed* by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). This is no surprise. The absence of Second Amendment protection for such weapons stems from the historical restrictions on dangerous and unusual weapons whether they are carried or, in Defendant's case, possessed in his home *and* in his pants.

With these historical traditions in mind, the Court's inquiry returns to the question previously discussed above: Are machineguns dangerous and unusual? The answer is yes, and the

---

[6] Citing 4 Blackstone 148–149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

prohibition in section 922(o) is consistent with this Nation's history of regulating such weapons. Thus, Defendant's challenge to § 922(o) fails.

### III.    Defendant's As-Applied Challenge Fails

Finally, Defendant fails to raise a successful as-applied challenge, which requires Defendant to show that the application of the challenged statute *to the facts of his case* would violate his constitutional rights. *Perez*, 43 F.4th at 443. Defendant's motion, however, does not separately address his as-applied challenge nor does it address why he specifically should be permitted to possess machineguns or how the machineguns he possessed are not dangerous or unusual.

What's more, the grounds for precluding a person in these circumstances from receiving a gun, much less a machinegun, are clearly consistent with this nation's historic traditions of disarming unvirtuous or dangerous citizens and prohibiting the possession of dangerous and unusual weapons. Defendant was prohibited from receiving a firearm because he was under deferred adjudication probation for Aggravated Robbery, meaning that he had admitted his guilt to the crime. *See* Tex. Pen. Code § 42A.053(a)(1); *see also United States v. Valentine*, 401 F.3d 609, 616 (5th Cir. 2005) (holding the defendant's deferred adjudication rendered him "under indictment" for purposes of § 922(n)). Yet, while still under probation for this violent crime, Defendant acquired two machineguns, one of which he was carrying when he was arrested. Defendant is the exact type of person that this nation has historically sought to disarm—a dangerous individual who should not be permitted to acquire firearms—and he acquired the exact sort of dangerous and unusual firearms that this nation has historically regulated. In these circumstances, a hold on Defendant's ability to receive guns while "under indictment" and the prohibition on his ability to possess machineguns do not violate the Second Amendment.

## CONCLUSION

For the reasons above, this Court should deny Defendant's Motion to Dismiss.

Respectfully submitted,

Ashley C. Hoff
United States Attorney

_/s/_
BRIAN NOWINSKI
Assistant United States Attorney
Michigan Bar No. P80027
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7068

CERTIFICATE OF SERVICE

     I certify that on November 11, 2022, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will serve all parties of record.

/s/

                    BRIAN NOWINSKI
                    Assistant United States Attorney