UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | 5:22-CR-00379-JKP |
| | § | |
| | § | |
| MARLON LARON SIMIEN | § | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO DISMISS**

MAUREEN SCOTT FRANCO
Federal Public Defender

_____

/s/ MOLLY LIZBETH ROTH
Assistant Federal Public Defender
Western District of Texas
727 East César E. Chávez Blvd., B–207
San Antonio, Texas 78206–1205
(210) 472-6700
(210) 472-4454 (Fax)
State Bar Number: 24040140

*Attorney for Defendant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

I.   INTRODUCTION .................................................................................... 1

II.   ARGUMENT ........................................................................................... 2

   A.   Section 922(n) Violates the Second Amendment, Both Facially and as Applied to Mr. Simien. .................................................................................................. 2

      *1.   The Second Amendment's plain text covers § 922(n) conduct.* ........................................ 3

      *2.   The Government has not met its burden to show that § 922(n)'s restrictions on firearms for those under indictment are "consistent with the Nation's historical tradition of firearm regulation."* ................................................................................. 6

      *3.   Section 922(n) violates the Second Amendment as-applied to Mr. Simien.* ................... 21

   B.   Section 922(o) Violates the Second Amendment ........................................... 22

III.   CONCLUSION ...................................................................................... 25

TABLE OF AUTHORITIES

**Cases**

*Binderup v. Att'y General United States of America*, 836 F.3d 336 (3d Cir. 2016) .................... 21

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................................. 23, 24

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................................ passim

*Hollis v. Lynch*, 121 F. Supp. 3d 617 (N.D. Tex. 2015) ............................................................ 21

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ............................................................ 22, 23, 24

*Jones v. Bonta*, 34 F.4th 704 (9th Cir.), *opinion vacated on reh'd,* 47 F.4th 704 (9th Cir. 2022) . 4

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ..................................................................... 5, 8, 10

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ...................................................................... 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ........................ passim

*Rigby v. Jennings*, --- F. Supp. 3d ---, 2022 WL 4448220 (D. Del. Sept. 23, 2022) .................. 23

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ......................................................... 4

*United States v. Arzberger*, 592 F. Supp. 2d 590 (S.D.N.Y. 2008) ............................................. 18

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011) ................................................................. 8

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) ......................................................... 9

*United States v. Charles*, --- F. Supp. 3d ---, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022) ........ 20

*United States v. Collette*, --- F. Supp. 3d ---, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022) .... 20

*United States v. Kays*, --- F. Supp. 3d ---, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) 3, 6, 19, 20

*United States v. Laurent*, 861 F. Supp. 2d 71 (E.D.N.Y. 2011) ......................................... 3, 4, 5, 9

*United States v. Love*, No. 20-cr-20327, 2021 WL 5758940 (E.D. Mich. Dec. 3, 2021) ........... 3, 9

*United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020) ......................................................... 17

*United States v. Quiroz*, --- F. Supp. 3d ---, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) passim

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ............................................................... 11

*United States v. Stambaugh*, No. 22-cr-218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022) ........................................................................................................................ passim

*United States v. Torres*, 566 F. Supp. 2d 591 (W.D. Tex. 2008) ................................................ 17

**Statutes**

18 U.S.C § 922(g)(1) ........................................................................................... 10, 11, 20

18 U.S.C. § 3142(c)(1)(B)(viii) ............................................................................ 16, 17, 18

18 U.S.C. § 922(n) ....................................................................................................... passim

18 U.S.C. § 922(o) ............................................................................................... 1, 22, 25

La. Stat. Ann. § 40:1379.3(C)(10) ............................................................................. 15

Tex. Gov't Code Ann. § 411.172(a)(4) ...................................................................... 15

## I.      INTRODUCTION

On October 11, 2022, Marlon Laron Simien moved this Court to dismiss both counts of the Indictment in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *See* Doc. No. 27. In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment challenges, abrogating the test used by the Fifth Circuit in favor of a new test rooted in history. Mr. Simien is charged with receipt of a firearm while under indictment, in violation of 18 U.S.C. § 922(n), and possession of a machine gun, in violation of 18 U.S.C. § 922(o). Doc. No. 15. Neither statute can survive scrutiny under the new *Bruen* test. The only court in the Fifth Circuit to consider § 922(n) found it violated the Second Amendment. *See United States v. Quiroz*, --- F. Supp. 3d ---, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022). And while no court has addressed § 922(o) since *Bruen*, it likewise involves protected conduct and is not supported by an historical tradition.

On November 11, 2022, the Government filed a Response. *See* Doc. No. 31. The Government argues that § 922(n) is constitutional, because: 1) receipt of a firearm is not protected by the Second Amendment, 2) § 922(n) is consistent with the Nation's historical traditions, and 3) despite growing judicial support for the unconstitutionality of § 922(n), the "weight of persuasive authority," as measured by a single Oklahoma opinion, confirms its consistency with historical tradition. *See* Doc. No. 31 at 7, 10-22. The Government further argues that § 922(o) is constitutional because: 1) machine guns are not protected by the Second Amendment, because they are not "in common use," and are "dangerous and unusual," and 2) the same reasons demonstrate an "historical tradition" and obviate the need for an actual historical analysis. *See* Doc. No. 31 at 7-10, 22-23. Each of the Government's arguments fails. Therefore, Mr. Simien renews his request that this Court dismiss the Indictment.

## II.      ARGUMENT

The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), changed the framework for analyzing Second Amendment challenges. The Court disposed of the means-end scrutiny step of the widely accepted two-step framework, and clarified that the first step itself was "broadly consistent with [*District of Columbia v. Heller*, 554 U.S. 570 (2008)], which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127. Under the *Bruen* framework "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside of the Second Amendment's 'unqualified command.'" *Id*. (citation omitted).

**A.  Section 922(n) Violates the Second Amendment, Both Facially and as Applied to Mr. Simien.**

Applying *Bruen*, § 922(n) violates the Second Amendment both facially and as applied to Mr. Simien. The plain text of the Second Amendment clearly protects the purchase or receipt of firearms and § 922(n) is not consistent with the country's historical tradition of firearm regulations. *See Bruen*, 142 S. Ct. at 2126.

The Government largely disregards the *Bruen* framework and other relevant caselaw. On the first step, the Government asserts that only *possession*, not *receipt*, of a firearm is protected by the Second Amendment. It ignores that virtually every court to address the issue has found that *receipt* of a firearm, including by one under indictment, is protected by the Second Amendment. On the second step, the Government fails to meet its considerable burden to show an historical basis for restricting firearm receipt for those under indictment. Rather than identify founding-era

2

restrictions on firearms for those under indictment, the Government points generally to what it identifies as a tradition of restricting firearms for "unvirtuous or dangerous" people, and to a handful of primarily 20th century dissimilar restrictions. *See* Doc. No. 31 at 18-22. The argument is analytically irreconcilable with *Bruen*.[1] Because the Government cannot meet its burden, the Court should find § 922(n) violates the Second Amendment and dismiss Count Two of the Indictment.

    *1.   The Second Amendment's plain text covers § 922(n) conduct.*

    Under *Bruen*'s new framework, courts must first determine whether the Second Amendment's plain text covers the conduct at issue. 142 S. Ct. at 2129–30. If so, the Constitution presumptively protects the conduct. *Id.* The Second Amendment mandates that a "well regulated militia, being necessary to the security of a free state, *the right of the people to keep and bear arms, shall not be infringed*." U.S. CONST. amend. II (emphasis added). The plain text of the Second Amendment clearly covers the conduct at issue in § 922(n)—i.e., receipt of a firearm.

    Every court to consider this question since *Bruen* has agreed that § 922(n) conduct is covered by the Second Amendment. *See United States v. Stambaugh*, No. 22-cr-218-PRW-2, 2022 WL 16936043, at *2-3 (W.D. Okla. Nov. 14, 2022); *United States v. Quiroz*, --- F. Supp. 3d ---, 2022 WL 4352482, at *3-4 (W.D. Tex. Sept. 19, 2022); *United States v. Kays*, --- F. Supp. 3d ---, 2022 WL 3718519, at *2 (W.D. Okla. Aug. 29, 2022).[2] Even prior to *Bruen*, courts routinely found the same. *See, e.g., United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011); *United States v. Love*, No. 20-cr-20327, 2021 WL 5758940, at *3 (E.D. Mich. Dec. 3, 2021). The

---

[1] The Government appears to rely primarily on its interpretation of language from *Heller*, even where that interpretation plainly conflicts with *Bruen*.

[2] The court in *Kays* ultimately determined that § 922(n) did not violate the Second Amendment, but agreed on this step of *Bruen*, that the conduct was protected by the Second Amendment.

Government disregards this caselaw and the underlying reasoning, and its argument is without merit.

The Government argues primarily that only *possession* of a firearm is protected by the Second Amendment, not *receipt*. *See* Doc. No. 31 at 7. It cites to no caselaw for this proposition and focuses on the words "keep and bear" from the Second Amendment, which it concludes only encompass possession. *See id*. Even accepting the Government's construction, the Government ignores that the right to possess a firearm is directly implicated by restrictions on receipt of firearms. *See, e.g., Laurent*, 861 F. Supp. 2d at 85 ("Unless the defendant already possesses a firearm prior to his indictment, § 922(n) does deny him the ability to keep and bear arms for the purpose of self-defense in his home."); *cf. Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) ("Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense . . . .").[3] The Government instead cites inapposite opinions that speak to the question of whether there is a right to *sell* a firearm, as opposed to *purchase* or *obtain* a firearm. Doc. No. 31 at 7.

The Government does not identify a single case that has held receipt or purchase of a firearm is not protected by the Second Amendment. At least one of the cases it cites for this proposition says precisely the opposite. Doc. No. 31 at 7 (citing *Laurent*, 861 F. Supp. 2d at 85, to distinguish between possession and receipt). The *Laurent* court explained: "Unless the defendant already possesses a firearm prior to his indictment, § 922(n) does deny him the ability to keep and bear arms for the purpose of self-defense in his home. This burden may last for a year or more

---

[3] Moreover, courts have held that *receipt*, as well as other conduct beyond firearm possession, is itself protected by the Second Amendment. *See Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir.), *opinion vacated on reh'g,* 47 F.4th 704 (9th Cir. 2022) ("Similarly, without the right to obtain arms, the right to keep and bear arms would be meaningless . . .. For this reason, the right to keep and bear arms includes the right to purchase them.").

before the initial indictment is adjudicated. Section 922(n) does infringe on Second Amendment rights." *Laurent*, 861 F. Supp. 2d at 85 (cleaned up).

The Government also implicitly argues that the Second Amendment does not protect the right to obtain a firearm *if one is under indictment*. *See* Doc. No. 31 at 7.[4] It is incorrect. The Government fails to explain why a person under indictment would be excluded from the Second Amendment, even if one understood the right to apply only to law-abiding citizens. Those under indictment *are* law-abiding citizens. *See Stambaugh*, 2022 WL 16936043, at *2 ("as a person who is presumed to be a law-abiding citizen until proven otherwise at trial, [the defendant] remains part of 'the people' whom the Second Amendment protects."); *Laurent*, 861 F. Supp. at 102 ("Thus, for the purposes of construing the statute, a defendant under indictment is a 'law-abiding citizen' who remains eligible for Second Amendment protection."). Moreover, as explained in Mr. Simien's Motion to Dismiss, a person's status—i.e., whether he is under indictment—is properly considered at the next stage of the *Bruen* analysis. *See* Doc. No. 27 at 6-8 (citing *Kanter v. Barr*, 919 F.3d 437, 451-52 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111). The Second Amendment applies to all Americans. Whether certain categories can be restricted is a question of the power of the government and its historical traditions, not whether individuals possess the right at all. *See id*. Every court to consider this issue in the § 922(n) context since *Bruen* agreed with the defendant that status is not properly considered at this stage in the *Bruen* analysis, or that those under indictment are otherwise protected by the Second Amendment. *See Stambaugh*,

---

[4] While the Government does not include legal analysis of this issue, it begins its argument by stating "Defendant cannot show that the Second Amendment's text covers receiving a gun while under felony indictment." *See* Doc. No. 31 at 7. The Government thus suggests that it is Mr. Simien's burden to show that receiving a firearm *while under indictment* is conduct protected by the Second Amendment.

2022 WL 16936043, at *2; *Quiroz*, 2022 WL 4352482, at *3-4; *Kays*, 2022 WL 3718519, at *2. The Government declined to address this issue in its Response.

Therefore, the plain text of the Second Amendment covers Mr. Simien's conduct and the conduct at issue more broadly in § 922(n), so the law is presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2129-30.

2. *The Government has not met its burden to show that § 922(n)'s restrictions on firearms for those under indictment are "consistent with the Nation's historical tradition of firearm regulation."*

Because the plain text of the Second Amendment protects receipt of a firearm, the Government bears the burden to show that the restriction in § 922(n) is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. There is no historical tradition as described in *Bruen* of depriving those who have been merely accused of a crime of their right to bear arms. *See Stambaugh*, 2022 WL 16936043, at *4-6; *Quiroz*, 2022 WL 4352482, at *4-8. Under *Bruen*, the Government must provide specific "distinctly similar" prohibitions, focusing on the founding era, that demonstrates a tradition of broadly prohibiting conduct in the manner of § 922(n). *See generally Bruen*, 142 S. Ct. at 2111.

The Government bears a considerable burden to demonstrate this historical tradition under *Bruen*. The Government must itself conduct the historical survey, and provide examples of such a broad tradition, as opposed to a select few outliers. *See id*. at 2130 n.6, 2138, 2156. The Court also explained that greater weight is given to restrictions from the founding era, and post-enactment history or 20th century examples are treated with skepticism. *See id*. at 2136-37. Finally, the *Bruen* Court articulated two different standards for comparing historical restrictions. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131 (emphasis added).

Under *Bruen*, "distinctly similar" means meaningfully the same, not merely analogous.[5] On the other hand, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. Such cases will involve "reasoning by analogy," or consideration of whether there are "relevantly similar" historical restrictions, which have similar reasons for and means of impairing the Second Amendment right. *See id*. at 2132-33. As in *Bruen*, the relevant inquiry in this case is "straightforward" and addresses a persistent societal problem, so the Government must show examples that are "distinctly similar" to § 922(n).

Apart from failing to meet its burden substantively, the Government misapplies the *Bruen* framework. The Government acknowledges that *Bruen* announced two different standards—a "straightforward historical inquiry," referred to as the "distinctly similar" analysis in Mr. Simien's briefing, and "historical analogy," referred to as the "relevantly similar" analysis. *See* Doc. No. 31 at 10. The Government appears not to appreciate the distinctions between these approaches, instead simply applying an historical analysis based on analogy, rather than identifying distinctly similar restrictions. It is wrong. As explained above, the standard applied by the Government is reserved for cases involving "dramatic technological changes," but here, it must identify "distinctly similar" restrictions, or those that are meaningfully the same. The Government instead posits that the general principle of disarming "unvirtuous and dangerous" individuals supports a finding of such an historical tradition. *See* Doc. No. 31 at 10-16. The approach is foreclosed by *Bruen*. The Government also appears to acknowledge that no explicit restrictions on firearm receipt existed

---

[5] The *Bruen* Court did not expressly define "distinctly similar," but the only historical example it identified as being sufficiently similar to analogize to the challenged New York public carry statute, was a 19th century Texas statute that forbade anyone from "carrying on or about his person any pistol unless he has reasonable grounds for fearing an unlawful attack on his person." *Bruen*, 142 S. Ct. at 2153 (quoting 1871 Tex. Gen. Laws § 1). The statute is effectively identical to the New York statute which required applicants to demonstrate "proper-cause" to obtain a public-carry license. This example and the remainder of the *Bruen* analysis indicate that "distinctly similar" means that the statutes are meaningfully the same, not simply "relevantly similar," or analogous.

for those under indictment prior to the 20th century. Nevertheless, it points to 20th century laws and 19th century surety laws rejected by *Bruen*, none of which are distinctly similar to § 922(n), and all of which are inconsistent with *Bruen*'s focus on founding-era restrictions.

### *Historical Tradition of Disarming Those Viewed as Unvirtuous or Dangerous*

The Government offers few specific historical examples of firearms restrictions and, instead, relies largely on what it describes as an historical tradition of restricting firearm access for those viewed as "unvirtuous or dangerous." *See* Doc. No. 31 at 10-16. It notes that the Second Amendment incorporated "'a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible' and 'does not preclude laws disarming the unvirtuous (i.e., criminals).'" *See* Doc. No. 31 at 12 (quoting *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011)). While the Government cites to no specific statutes, it flags that those historically understood to be restricted from firearm possession included: those who "refused to swear an oath of allegiance," "felons and the mentally ill," and "illegal aliens and juveniles." Doc. No. 31 at 1-13.[6] It then argues that limiting firearms for those under indictment, serves this same historical interest of disarming "unvirtuous or dangerous" individuals. *See* Doc. No. 31 at 14-15. The Government's argument fails.

This is simply not the test laid out by *Bruen*. The Supreme Court explained clearly that the "government may not simply posit that the regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. The Government must actually point to specific historical examples that are "distinctly similar" to the challenged restriction. In this section of its brief, the Government instead

---

[6] The Government does not include in its list the most consistently disarmed communities from the founding: slaves and Native Americans. *Cf. Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barret, J., dissenting) ("Slaves and Native Americans, on the other hand, were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course.").

identifies a theme or policy goal, and some general species of restrictions, without pointing to specific statutes.[7] The general goal of disarming dangerous people is not, itself, an historical example.

Moreover, none of the cited sources say anything about those under indictment, and the vague rule pronounced by the Government is certainly not "distinctly similar" to § 922(n). The Government ignores the judicial consensus, and constitutional truism, that those under indictment are "law-abiding citizens," such that they would not fit squarely within the Government's conception of "unvirtuous or dangerous" individuals. The Government does not explain how presumptively innocent people under indictment—particularly those, like Mr. Simien who were under indictment or deferred adjudication for nearly five years—are "unvirtuous or dangerous" like felons or the mentally ill. Nor does it explain how an indictee is similar to an "illegal alien," for whom the cited cases upheld firearms restrictions specifically because they were, by definition, not law-abiding. *See United States v. Carpio-Leon*, 701 F.3d 974, 980-81 (4th Cir. 2012). Every court to look at this issue has recognized a meaningful difference between felons and those merely under indictment. *See, e.g., Laurent*, 861 F. Supp. 2d at 90-93, 102-03 (finding the right was protected and not subject to historical restriction under the first step of the existing framework); *Love*, 2021 WL 5758940, at *3; *see also Stambaugh*, 2022 WL 16936043; *Quiroz*, 2022 WL 4352482, at *10.[8] And the failure to actually provide historical examples of such restrictions, impairs the ability to assess whether they broadly existed at the time of the founding.

---

[7] The closest the Government comes to identifying specifical historical statutes, is a citation that explains that, during the revolution, Massachusetts and Pennsylvania confiscated weapons from those who would not swear loyalty to the United States. *See* Doc. No. 31 at 11 (citing *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019)).

[8] The Government also argues that this Court should infer an historical basis for depriving indictees of firearms, because those *convicted* of felonies were often put to death. *See* Doc. No. 31 at 15. The argument is meritless. The Government misleadingly cites to *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) for this proposition, despite *Medina* saying nothing at all about those under indictment. The Government

The Government fails in this argument to identify any restrictions from the founding era that are "distinctly similar" to § 922(n). Because it is not the Court's job to conduct its own historical survey on the Government's behalf, the analysis should end here.[9] *Bruen*, 142 S. Ct. at 2130 n.6, 2150. The lack of distinctly similar historical regulations addressing the problem and apparent attempts to address the societal problem through materially different means are "probative evidence of unconstitutionality." *Id.* at 2131.

### *Section 922*

The Government next appears to argue that § 922 itself can demonstrate an historical tradition sufficient to uphold § 922(n). *See* Doc. No. 31 at 15-16. Rather than apply *Bruen*'s standard, the Government insists that certain statutes should be upheld based on its assessment that they are sufficiently "longstanding." This argument contravenes logic and *Bruen*'s framework and misapplies *Heller*.

As explained in *Quiroz*, the positions rests on several logical fallacies. *Quiroz*, 2022 WL 4352482, at *5. The Government's position is that: 1) *Heller* endorsed felon-in-possession laws, 2) felon-in-possession laws have the same history as § 922(n), and 3) therefore, § 922(n) is constitutional. *See id.* But nowhere in *Bruen* or *Heller* did the Court announce that a shared historical pedigree renders statutes similarly constitutional. Moreover, *Heller* did not find that § 922(g)(1) was constitutional but noted in dicta the Court was not overturning such laws. *See United*

---

again asks this Court to presume that the distinction between a felon and a person under indictment is semantic, but that distinction is a fundamental cornerstone of American jurisprudence. Moreover, the Government overstates the connection between felony convictions and capital punishment by the time of the founding. *See Kanter v. Barr*, 919 F.3d 437, 458-59 (7th Cir. 2019) (Barret, J., dissenting).

[9] Even if the Government could show that disarming indictees was an unprecedented modern problem, it cannot meet the less onerous "relevantly similar" standard. For that, the Government still must show *specific* historical examples from the founding era, demonstrating a "tradition of broadly prohibiting" the conduct in question. *See Bruen*, 142 S. Ct. at 2138, 2156.

*States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). The Government attempts to evade the clear framework laid out in *Bruen* by asserting: "*Heller*'s point in endorsing felon-in-possession laws was not that they had existed in their modern form since the founding but that they were *analogous enough* to historical regulations to be deemed 'longstanding.'" *See* Doc. No. 31 at 15-16 (citing *Heller*, 544 U.S. at 626-27). But the *Heller* opinion says nothing at all about reasoning by analogy, let alone anything like this.[10] The test under *Bruen* is whether historical examples support the constitutionality of a challenged statute, not whether the challenged statute has been around long enough to be deemed "longstanding."

Even assuming the Government's argument is that § 922(g)(1) is itself an historical example under *Bruen*, it fails to satisfy any of the criteria. The *Bruen* court laid out a clear framework for analyzing Second Amendment challenges after *Heller*, including detailing how to approach historical analogues and the relevant weight to be given to restrictions different time periods. Section 922(g)(1) was passed in 1938, so it is clearly not from the founding era. *See Quiroz*, 2022 WL 4352482, at *5. And the Government offers no explanation for how restricting felons from having firearms is "distinctly similar" to restricting indictees.

Under the *Bruen* framework, § 922(g)(1) is not a founding-era distinctly similar statute to § 922(n).

### *Surety Statutes*

The Government also notes that surety statutes could be a potential historical analogue for § 922(n). *See* Doc. No. 31 at 16-17. It identifies a group of mid-19th century statutes—rejected as

---

[10] The *Heller* Court simply said "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." *Heller*, 544 U.S. at 626. It says nothing about finding certain restrictions longstanding by analogy to other restrictions. The Government may have misunderstood earlier language in the paragraph about "state analogues" for the Second Amendment, which of course are nothing like historical statutory analogues for modern restrictions.

historical evidence in *Bruen*—which required certain dangerous individuals to post bond before carrying weapons in public. *See id*; *Bruen*, 142 S. Ct. at 2148. The Government cites to *Bruen*'s reference to an 1836 statute from Massachusetts, as well as 9 other unidentified statutes adopted between 1838 and 1871. *See id*. It also describes generally the British common-law tradition of "surety of the peace [that] followed an accusation by someone that an individual would likely violate the law in the future." *See id*. Such statutes are not sufficient historical evidence to prove the constitutionality of § 922(n). Multiple courts, including one in this District, have now rejected these surety statutes as historical support for § 922(n). *See Stambaugh*, 2022 WL 16936043, at *3-6; *Quiroz*, 2022 WL 4352482, at *7-8.

This Court should first reject these surety statutes as evidence of an historical tradition for the same reasons stated in *Bruen*. 142 S. Ct. at 2148-49. The *Bruen* Court explained that such statutes were of limited historical value because of a dearth of evidence that authorities ever enforced them, except pretextually against black defendants. *Id*. at 2149. As the *Bruen* Court explained:

> Besides, respondents offer little evidence that authorities ever enforced surety laws. The only recorded case that we know of involved a justice of the peace *declining* to require a surety, even when the complainant alleged that the arms-bearer "did threaten to beat, wound, maim, and kill" him . . . And one scholar who canvassed 19th-century newspapers—which routinely reported on local judicial matters—found only a handful of other examples in Massachusetts and the District of Columbia, all involving black defendants who may have been targeted for selective or pretextual enforcement . . . That is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.

*Bruen*, 142 S. Ct. at 2149 (cleaned up). The Court further noted, it is the Government's burden to show otherwise, and so it considered "the barren record of enforcement to be simply one additional reason to discount their relevance." *Id*. at 2149 n.25. The court in *Quiroz* rejected this evidence for the same reasons. *See Quiroz*, 2022 WL 4352482, at *7 (citing *Bruen*, 142 S. Ct. at 2149).

12

Such statutes are also not "distinctly," nor even "relevantly," similar to § 922(n).[11] The Government suggests that § 922(n) imposes a less restrictive imposition than surety statutes, because § 922(n) does not ban public carry and applies only during the pendency of the indictment. *See* Doc. No. 31 at 17. It is incorrect. The surety statutes only limited public carry, allowed the carrier to post bond, and applied to individuals who posed a specific threat. *See Bruen*, 142 S. Ct. at 2148–50. In contrast, § 922(n) criminally prosecutes any acquisition of a firearm by the accused without a "specific showing of reasonable cause to fear an injury, or breach of the peace," or other process. *See Bruen*, 142 S. Ct. at 2148; 18 U.S.C. § 922(n). Section 922(n) imposes a greater burden on individuals than the cited 19th-century surety statutes and with fewer procedural protections. *See Stambaugh*, 2022 WL 16936043, at *5 (finding "§ 922(n) is more restrictive than surety statutes with respect to 'the *central component* of the Second Amendment right': individual self-defense" and is more burdensome because of the lack of an individualized finding of dangerousness). Moreover, the mere fact that the "earlier generations addressed" this issue, "through materially different means" is evidence that § 922(n) is unconstitutional. *See Quiroz*, 2022 WL 4352482, at *8 (citing *Bruen*, 142 S. Ct. at 2131).

The time-period in which these surety statutes arose also weighs against relying on them under *Bruen*. The Government misleadingly offers that the "common-law surety practice carried over to the American colonies." Doc. No. 31 at 17. But such statutes were not adopted during the colonial or founding eras. Rather, they arose in the mid-19th century, so they have less significance for establishing historical tradition than laws passed around the founding. The *Bruen* Court

---

[11] The Government here offers that the surety laws "offer another imperfect but relevantly similar analogue to § 922(n)." Doc. No. 31 at 17. The Government offers no explanation for what modern issue or scientific advancement merits applying this standard. Moreover, its application of this standard strays dangerously close to means-end scrutiny, which was expressly rejected in *Bruen*. *See* 142 S. Ct. at 2129, 2131.

13

explained that, when interpreting the Constitution, the greatest weight is given to historical evidence that clarifies the understanding of a given right at the time of its adoption, while historical evidence from long before or after that adoption is less instructive. *See Bruen*, 142 S. Ct. at 2136–37. In challenges to state restrictions, like in *Bruen*, 19th century historical evidence is arguably entitled to weight, because the Fourteenth Amendment, which was passed in 1868, made the Second Amendment applicable to the states. *See Bruen*, 142 S. Ct. at 2135–38. Section 922(n), however, is a federal statute and the Second Amendment was directly applicable against the federal government upon its adoption in 1791. As Justice Barrett explained in a concurring opinion "today's decision should not be understood to endorse a freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'" *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring). Similarly, vaguely referenced common law traditions in England merit limited weight because they "long predate" the founding. *See id*. at 2136. The district court in the Western District of Oklahoma that recently found § 922(n) unconstitutional in *Stambaugh* explained as much, noting of the surety statutes that it considered "this history too far removed from 1791 such that 'they do not provide as much insight into the Second Amendment's original meaning as earlier sources.'" 2022 WL 16936043, at *4 (quoting *Bruen*, 142 S. Ct. at 2137) (cleaned up).

Because the Government has not identified *founding-era* examples of surety statutes, demonstrated that they were enforced, or shown that surety statutes were "distinctly similar" to § 922(n), it has failed to meet its burden. *See Stambaugh*, 2022 WL 16936043, at *3-6; *Quiroz*, 2022 WL 4352482, at *7-8.

14

### *20th Century Texas and Louisiana Statutes*

The Government next points to two public carry licensure statutes from Texas and Louisiana that it claims are sufficiently analogous to § 922(n) to show an historical tradition. Doc. No. 31 at 17-18 (citing Tex. Gov't Code Ann. § 411.172(a)(4); La. Stat. Ann. § 40:1379.3(C)(10)). The two modern statutes clearly fail to satisfy the *Bruen* standard.

Neither law comports with the *Bruen* Court's emphasis on historical evidence from the founding era. *See Bruen*, 142 S. Ct. at 2136-37. The Government does not state when the statutes became law, but the Texas statute was passed in 1997 and the Louisiana statute was passed in 1979. *See* 1997 Tex. Sess. Law Serv. Ch. 165 (S.B. 898); La. Acts 1979, No. 322, § 1. This is not the type of historical evidence relied on by the *Bruen* Court, which specifically declined to consider any 20th century evidence offered by the respondents in *Bruen*, noting it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 n.28.

Nor are the statutes "distinctly similar" to § 922(n). They do not limit receipt of firearms, but simply the licensing for public carry. The Government suggests that the public carrying licensure regime is somehow more restrictive than § 922(n), but as discussed elsewhere, for many indictees, the statute amounts to a total ban on firearm possession for years. The statutes, again, suggest that legislatures have historically addressed this issue by different means, and they are demonstrably not even "relevantly similar" to § 922(n), let alone "distinctly similar."

Finally, the Government only cites to two state examples, far short of the broad prohibitions it must show to meet its burden. *See Bruen*, 142 S. Ct. at 2138, 2156 (explaining the Government cannot rely on a select few "outlier" regulations, but must show "a tradition of broadly prohibiting"

15

the relevant conduct).[12] It is not this Court's responsibility to conduct a larger survey to see if other states have similar public-carry licensure restrictions for those under indictment. *See Bruen*, 142 S. Ct. at 2130 n.6, 2150. Nor would it matter, for the reasons discussed above.

### *Bail Reform Act of 1984*

The Government next argues that historical restrictions on those under indictment support § 922(n). *See* Doc. No. 31 at 18-19. The Government points primarily to 18 U.S.C. § 3142(c)(1)(B)(viii), which provides that, after a hearing, a court can order a person on pre-trial release to "refrain from possessing a firearm . . ." if the condition is "least restrictive," and will reasonably assure the appearance of the person and the safety of the community. The statute is neither historical enough nor "distinctly similar" enough to § 922(n) to support a finding of an historical tradition under *Bruen*.

While the Government calls the statute a "longstanding analogue" it was in fact passed in 1984 as part of the Bail Reform Act. Pub. L. No. 98-473, 98 Stat 1837 (1984). The law is even more recent than § 922(n), so the Government cannot credibly argue that it demonstrates a historical tradition upon which § 922(n) could rely. And, again, the *Bruen* Court declined to consider any 20th century historical evidence, explaining that such evidence was of limited significance for the Second Amendment historical analysis. *See Bruen*, 142 S. Ct. at 2136–2137, 2154 n.28.

The restriction is, furthermore, neither "distinctly" nor "relevantly" similar to § 922(n). The Government, again, makes no distinction between the two, but the "distinctly similar" standard should apply for the reasons discussed above. The two statutes are meaningfully different,

---

[12] The *Bruen* Court acknowledged that a 19th century Texas statute and related caselaw supported the challenged New York proper-cause requirement, but noted it was an outlier, and declined to interpret the Second Amendment based on such limited historical support. *Bruen*, 142 S. Ct. at 2153.

regardless of the standard, though. Under § 3142(c)(1)(B), the restriction can only occur after a hearing and finding that the condition is the least restrictive way of ensuring the person's appearance and the safety of the community. The Government acknowledges that this renders the statute more targeted than § 922(n), but suggests that that is simply nullified by the fact that § 922(n) applies to a narrower group of offenses and only bars receipt, not all possession. *See* Doc. No. 31 at 19.

Respectfully, the additional burden of depriving somebody of a hearing is far more significant than any distinction between possession and receipt, or the distinction the Government draws about the types of offenses covered by § 922(n).[13] The court in *Quiroz* noted that the absence of procedural protections in grand jury proceedings casts a "shadow of constitutional doubt on § 922(n)." *Quiroz*, 2022 WL 4352482, at *10. It explained its skepticism of the Government's comparison of § 922(n) to restrictions imposed at a detention hearing, reasoning:

> detention hearings have substantial procedural safeguards. For one thing, at a detention hearing, the defendant may request the presence of counsel; testify and present witnesses; proffer evidence; and cross-examine other witnesses appearing at the hearing. Grand jury proceedings have none of these safeguards.

*Id*. at *11 (cleaned up). Other courts have acknowledged the importance of a hearing protecting a person's Due Process, but also Second Amendment, rights. *See United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020) (upholding § 922(g)(8) to Second Amendment challenge in part because of the protection of a hearing); *see also United States v. Torres*, 566 F. Supp. 2d 591 (W.D. Tex. 2008) (Cardone, J.) (finding the Adam Walsh Amendments, which mandated release conditions including on firearm possession for those charged with sex offenses, violated the Due Process

---

[13] Section 922(n) applies to any federal or *state* felony, punishable by more than one year, regardless of whether it was violent. This is undoubtedly a larger group of offenses than the federal offenses for which § 3142 applies.

Clause of the Fifth Amendment); *United States v. Arzberger*, 592 F. Supp. 2d 590, 602 (S.D.N.Y. 2008).[14] In the context of a Due Process challenge, the court in *Arzberger* explained, "there is no basis for categorically depriving persons who are merely accused of certain crimes of the right to legal possession of a firearm." *Id*. at 602. Even if this Court were to apply the "relevantly similar" standard, the absence of a hearing in § 922(n) makes § 3142(c)(1)(B)(viii) a poor analogue, and one that does not have a comparable burden or justification. *See Bruen*, 142 S. Ct. at 2133.

Simply put, a 1984 statute that permits courts to disarm indictees pretrial after a hearing, does not provide an historical basis for an earlier 20th century statute prohibiting all firearm receipt for those under certain state or federal indictments.

### *Existing Caselaw*

The Government also argues that the "weight of persuasive authority supports the government's position" that § 922(n) is constitutional. Doc. No. 31 at 19. The position is puzzling because the only court in the Fifth Circuit to consider the question since *Bruen* found § 922(n) unconstitutional. *See Quiroz*, 2022 WL 4352482. Now, another court in the Western District of Oklahoma has likewise found § 922(n) unconstitutional, rejecting many of the arguments raised by the Government here. *See Stambaugh*, 2022 WL 2022 WL 16936043. There is no "weight of persuasive authority" for the Government's position, and indeed the number of courts rejecting its arguments is growing. But the Government argues that this Court should instead follow the lead

---

[14] The Government argues that these cases have no relevance because they address Due Process not the Second Amendment. Of course, the imposition on a person's Due Process rights speaks to the *Bruen* consideration of whether an historical analogue comparably burdens the right. *See Bruen*, 142 S. Ct. at 2133. The Government also notes that the "rights asserted in those cases do not limit Congress's power to define criminal conduct." *See* Doc. No. 31 at 19 n.5. The Government cites to nothing for its declaration but appears to suggest that judicial review does not apply to or is somehow limited if it addresses "Congress's power to define criminal conduct." Counsel is aware of no case supporting the position; in fact, innumerable judicial opinions demonstrate that courts can strike down criminal statutes if they are unconstitutional.

of a single court in the Western District of Oklahoma. *See United States v. Kays*, No. 5:22-cr-40, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022). The Government's argument is unpersuasive.

The Government's reliance on *Kays* is misplaced. First, the court in *Kays* disagreed with the Government on virtually every analytical aspect of the *Bruen* analysis. The court rejected the government's efforts to rely on "dicta in both *Bruen* and *Heller*," to uphold the statute, explaining that *Bruen* is an intervening decision, abrogating 10th Circuit cases on § 922(n), and merited analysis under the new *Bruen* framework. *Id*. at *1-2. In applying that framework, the court concluded that conduct at issue in § 922(n) is covered by the plain text of the Second Amendment. *See Kay*, 2022 WL 3718519, at *2. As to the second part of the *Bruen* framework, the court expressed skepticism about the government's legal reasoning, noting:

> The government attempts to establish that each statute is consistent with a historical tradition of firearm regulation by using broad arguments that do not directly address a history of firearm possession by those subject to a protective order, or firearm receipt by those under indictment.

*Id*. at *3. Nevertheless, the court found that the government had met its burden to show that § 922(n) was consistent with historical traditions, because the proffered 19th century surety statutes could serve as historical analogues. *Id*. at *4-5. As described above, though, these surety statutes are neither "distinctly similar," nor sufficiently historical under *Bruen*, and were expressly rejected in *Bruen* because of the absence of evidence that they were enforced. The *Kays* court also applied something like the "relevantly similar," standard that looked troublingly like "means-end scrutiny," to reach its conclusion. *See id*. at *5 (focusing on the relative "narrowness" and "restrictiveness" of § 922(n) and the surety statutes). The only issue on which the *Kays* court agrees with the Government—i.e., surety statutes as an historical analogue for § 922(n)—is plainly erroneous and expressly foreclosed by *Bruen*, as acknowledged by both subsequent opinions which

found § 922(n) unconstitutional. *See Stambaugh*, 2022 WL 2022 WL 16936043, at *4-6; *Quiroz*, 2022 WL 4352482, at *7-8.

Nevertheless, the Government argues that the Court should follow *Kays* and reject the more recent *Quiroz* opinion from this District. The Government's primary argument appears to be that the *Bruen* standard is too onerous, and the *Quiroz* court should have disregarded it at the Government's behest. *See* Doc. No. 31 at 20-21. Neither the *Quiroz* court, nor this Court, however, can simply determine that the Supreme Court was wrong in *Bruen*, and permit the Government to evade its burden to show a broad tradition of founding-era "distinctly similar" prohibitions. Moreover, the Government's stated fear that "even felon-in-possession law" would be unlikely to survive Judge Counts's reasoning in *Quiroz* is absurd and ignores that Judge Counts has twice upheld § 922(g)(1) since his *Quiroz* opinion, applying the same framework. *See United States v. Charles*, --- F. Supp. 3d ---, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Collette*, --- F. Supp. 3d ---, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022).

The Government's further arguments largely repeat the historical examples from its brief—e.g., that § 922(g)(1) shares a similar pedigree to § 922(n), that surety statutes are "relevantly similar," or that "shall issue" public carry laws in Texas and Louisiana operate "almost identically to § 922(n)." *See* Doc. No. 31 at 20-22. The Government's arguments consistently ignore that these restrictions are inconsistent with *Bruen*'s emphasis on founding era restrictions, and otherwise simply repeat the Government's poorly supported view that the *Quiroz* court failed to understand what constitutes sufficient similarity under *Bruen*. For the reasons discussed above, these historical examples plainly fail the *Bruen* standard. The Government's apparent unwillingness to acknowledge the basic tenets of the *Bruen* framework should make this Court skeptical about its insistence that the Government is right and the *Quiroz* court (and indeed, now, the *Stambaugh*

court) was wrong. The *Quiroz* court had the benefit of the exact same arguments the Government raises now, as well as the *Kays* opinion, and rejected them in a detailed and well-reasoned opinion, consistent with *Bruen*.[15]

> 3.   *Section 922(n) violates the Second Amendment as-applied to Mr. Simien.*

Mr. Simien also argued that § 922(n) violates the Second Amendment as applied to him, because, even if the Court found a historical tradition of disarming indictees, there is no such tradition of disarming indictees under these circumstances. Courts recognized even prior to *Bruen* that as-applied challenges to firearms restrictions might be more readily granted than facial challenges. *See, e.g., Binderup v. Att'y General United States of America*, 836 F.3d 336, 345 (3d Cir. 2016). Where there is uncertainty as between a facial or as-applied challenge, courts first consider constitutional challenges as-applied to avoid striking down the statute in its entirety. *See Hollis v. Lynch*, 121 F. Supp. 3d 617, 629-30 (N.D. Tex. 2015) (citing *United States v. Vuitch*, 402 U.S. 62, 70 (1971), *Renne v. Geary*, 501 U.S. 312, 324 (1991)).[16]

Because receipt of a firearm is plainly covered by the Second Amendment, the Government bears the burden of showing that disarming those like Mr. Simien is consistent with the Nation's historical traditions. *See Bruen*, 142 S. Ct. at 2130. It declines to do so, instead arguing conclusorily and without citation, that Mr. Simien failed to address why he should be permitted to possess the firearms in question. *See* Doc. No. 31 at 23. Of course, it is the Government's burden to show consistency with historic tradition. And the historical examples proffered in its facial argument

---

[15] Indeed, the *Quiroz* court rejected the arguments even more explicitly in a subsequent order, after the Government argued that the defendant should be detained without an indictment pending the Government's appeal, based on its belief that it would prevail on appeal. *See United States v. Quiroz*, No. 4:22-cr-104-DC, Doc. No. 88 at 4-6 (W.D. Tex. Sept. 26, 2022).

[16] The *Bruen* Court drew no distinction between an as-applied or facial challenge under the Second Amendment; in fact, neither term appears anywhere in the majority opinion.

would have even less applicability in this case. Specific facts for Mr. Simien's as-applied challenge demonstrate the restriction is more burdensome as-applied to him, including: (1) that he only purchased a firearm, rather than shipping or transporting a firearm, as is also criminalized by § 922(n), and (2) that he had been under indictment or deferred adjudication for nearly five years at the time of the arrest for the § 922(n) offense. *See* Doc. No. 27 at 6 n.4 (noting that such facts related to Mr. Simien's as-applied challenge). The "similarity" of each of the Government's purported analogues is undermined by the length of time of Mr. Simien's indictment.

\*                                   \*                                   \*

Respectfully, the Government has fallen far short of the burden it must meet following *Bruen*. It details policy reasons for dispossessing felons and other dangerous individuals of firearms, but it has not pointed to sufficient historical basis for its argument that § 922(n) is consistent with the Nation's historical tradition of firearms regulation. In fact, now multiple courts have found that § 922(n) is unconstitutional under the *Bruen* standard. The reason is simple; there is no such historical tradition of preventing those under indictment from receiving firearms. Therefore, the Court should find that the statute violates the Second Amendment facially and as applied to Mr. Simien. *See* U.S. CONST. amend. II; *Heller*, 554 U.S. at 628; *See Bruen*, 142 S. Ct. at 2126. Because § 922(n) is unconstitutional, the Court should dismiss Count Two of the Indictment.

### B.     Section 922(o) Violates the Second Amendment

Mr. Simien also argued that the statute prohibiting machine gun possession, 18 U.S.C. § 922(o), violates the Second Amendment under the *Bruen* framework. Prior to *Bruen*, the constitutionality of restrictions on specific types of firearms under the Second Amendment, turned on whether the firearm is in "common use," or "dangerous and unusual." *See generally Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016). Post-*Bruen*, the issue presents a complicated question for this

Court: whether the "common use" and/or "dangerous and unusual" questions are considered at the first step or second step of *Bruen*. There is some support for the position that the issue is considered at step one—i.e., whether the conduct is protected by the Second Amendment. *See Hollis*, 827 F.3d at 451. As explained in Mr. Simien's Motion to Dismiss, however, the plain language of *Heller*, *Bruen*, and at least one post-*Bruen* case, suggest that all arms are protected by the Second Amendment, and the question is rather whether there is an historical power to restrict them. *See* Doc. No. 27 at 14-15 (citing *Rigby v. Jennings*, --- F. Supp. 3d ---, 2022 WL 4448220, at *7 n.13 (D. Del. Sept. 23, 2022) (citation omitted)). The Government argues that whether a firearm is "dangerous" or "unusual" is in fact the ultimate question at both steps—i.e., it determines whether the conduct is protected by the Second Amendment *and* whether there is a historical tradition of similar restrictions. *See* Doc. No. 31 at 7-10, 22-23. The position is, of course, untenable.

With respect to *Bruen*'s first step, the Government's position appears to be, as it is in much of its briefing, that *Bruen* did not disturb any existing Second Amendment caselaw. Of course, *Bruen* abrogated most circuit caselaw in the Second Amendment area, and likely warrants revisiting many opinions decided under the now-defunct two-part framework. Mr. Simien maintains that the question of "common use," is properly considered in step two of *Bruen*. But even if the Court considers the question at step one, courts should revisit whether machine guns are in "common use" or "dangerous and unusual," in accordance with *Caetano v. Massachusetts*, 577 U.S. 411 (2016), and now, *Bruen*.

The Fifth Circuit reasoned six years ago that machine guns were not in "common use" and were "dangerous and unusual," under the Second Amendment. *See Hollis*, 827 F.3d 436. Citing to *Caetano*, the court acknowledged that these questions turned on the number of machine guns possessed around the country as well as how machine guns were treated under state law. *See id*. at

449-50. At the time, the court identified roughly 175,000 machine guns in existence and concluded that 34 states and the District of Columbia prohibited machine gun possession. *See id*. As of 2020, the national registry of machine guns identified over 726,000 lawful machine guns, which excludes other unlawfully possess machine guns, and according to one source, 35 states have minimal or no regulations of machine guns.[17] The Government argues that the increase of machine guns is irrelevant, because they make up a small percentage of overall firearms and still are less prevalent than some firearms deemed to be in "common use." *See* Doc. No. 31 at 9 (identifying cases that found 50 million large capacity magazines or 8 million semi-automatic rifles evidenced "common use"). These courts have, however, never held that there must be millions of a given firearm in circulation to be in common use. Indeed, the court in *Hollis* noted that a considerably lower number of weapons could constitute "common use," if considered in conjunction with their legality under state law. *See Hollis*, 827 F.3d at 450 (citing *Caetano*, 577 U.S. at 412-22 (Alito, J., concurring)) (finding "common use" for hundreds of thousands of stun guns which were legal in 45 states). Because of the greater number of machine guns today, and the apparent greater acceptance of them under state law,[18] courts should revisit whether machine guns are in "common use" or are "dangerous and unusual," particularly in light of the new *Bruen* framework.

   If the Court finds that machine guns are covered by the plain text of the Second Amendment at step one of the *Bruen* framework, the Government has assuredly failed to meet its burden at step two. The Government, again, frequently misunderstands Mr. Simien's arguments and the *Bruen* framework. It declines to conduct any historical analysis whatsoever, reasoning instead that the

---

[17] *See* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, *Machine Guns & 50 Caliber*, available at: https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/machine-guns-50-caliber/ (last visited Nov. 15, 2022).

[18] It is unclear whether the different survey of state law in *Hollis* reflected a misunderstanding of state law or differences in state law at the time.

sole question to be asked at both steps of *Bruen* is whether machine guns are "dangerous and unusual." This is not the "distinctly similar" or "relevantly similar" analysis outlined in *Bruen*, and the Government's refusal to engage in a serious historical analysis reflects disdain towards both *Bruen* and this Court. The Court should not substitute its own historical analysis, nor should it permit the Government to evade its burden under *Bruen*. *See Bruen*, 142 S. Ct. at 2130 n.6, 2138, 2156.

Therefore, the Court should find that § 922(o) violates the Second Amendment.

## III.    CONCLUSION

WHEREFORE, for the foregoing reasons and those stated in his Motion to Dismiss, Mr. Simien requests that the Court dismiss Indictment and order any other relief it deems necessary.

Respectfully Submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender

_____

/s/ MOLLY LIZBETH ROTH
Assistant Federal Public Defender
Western District of Texas
727 East César E. Chávez Blvd., B–207
San Antonio, Texas 78206–1205
(210) 472-6700
(210) 472-4454 (Fax)
State Bar Number: 24040140

*Attorney for Defendant*

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November, 2022, I electronically filed the foregoing with the Clerk of Courts using the CM/ECF system which will send notification of such filing to the following:

AUSA Brian M. Nowinski
United States Attorney's Office
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216

/s/ MOLLY LIZBETH ROTH
*Attorney For Defendant*
